**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

TOMMY PEARSON                                                                                       PLAINTIFF

v.                                    Case No. 4:07CV00163 JLH

CITY OF SHERWOOD                                                                               DEFENDANT

**OPINION AND ORDER**

Tommy Pearson brought this action asserting claims of race discrimination and hostile work environment against the City of Sherwood pursuant to 42 U.S.C. § 2000e *et seq.* (Title VII of the Civil Rights Act of 1964). The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. Before the Court is the defendant's motion for summary judgment. For the following reasons, that motion is denied.

**I.**

A court should enter summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). When a nonmoving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The moving party bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. If the moving party meets this burden, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue*

*for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting FED. R. CIV. P. 56(e)). A genuine issue for trial exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. In deciding a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party and draws all inferences in his favor, mindful that summary judgment seldom should be granted in discrimination cases where claims are often based on inferences. *Peterson v. Scott County*, 406 F.3d 515, 520 (8th Cir. 2005); *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1099 (8th Cir. 2000) (collecting cases). *But see Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 762 (8th Cir. 2004) (Arnold, J., dissenting).

## II.

In July 2006, Tommy Pearson applied for a job with the City of Sherwood as an equipment operator with the City's Street Department. Before being hired, Pearson was interviewed by Chester Brymer, the Street Department supervisor and Pearson's direct supervisor once he was hired, and Blake Martin, the Director of Public Works and Brymer's supervisor. The job description of an equipment operator summarized the position as follows: an operator "[o]perates a variety of contractor's equipment and trucks utilized in construction, maintenance and repair activities; performs a variety of semi-skilled tasks in the maintenance of street, water, and storm drainage systems." According to the job description, the minimum qualifications to be an operator include:

    1) Graduation from high school or GED equivalent.
    2) Four (4) years experience involving the use of medium and heavy equipment, two of which must have been related to utility or street systems.
    3) Considerable knowledge of heavy-equipment operating principles; working knowledge of the hazards and safety precautions common to heavy equipment operations; working knowledge of the methods, materials and tools used in street and utility maintenance work.

>   4) Skill in operation of listed tools and equipment.
>   5) Ability to understand and follow oral or written instructions; Ability to communicate effectively verbally and in writing; Ability to observe proper safety precautions; Ability to establish effective working relationships with other employees, supervisors and the public; Ability to perform heavy manual tasks under varying weather conditions; Ability to drive and operate a variety of equipment under varying conditions; Ability to work from construction specifications or blueprints.

The job description also includes one special requirement: Valid Arkansas operator's CDL license with a Class B endorsement, or ability to obtain one within six months of employment. While Pearson did have a valid Arkansas operator's CDL license with at least a Class B endorsement, he did not have a high school diploma. Apparently, he misrepresented the fact that he had graduated from high school on his application. However, according to Pearson, he did admit that he lacked four years experience involving the use of medium and heavy equipment, but the City of Sherwood hired him nevertheless because of his CDL qualifications. Pearson began work on August 7, 2006.

Pearson immediately began to have a problem with a co-worker, Nathaniel Haggard, starting on Pearson's first day. Pearson kept notes in a diary regarding his interactions with Haggard, which stated the following:

>   Monday Aug 7 I (Tommy Pearson was talking to one of the employees and he (Nathan Haggard) told me that he didnt like "black people" and then he told me that all the other blacks that has worked for the City of Sherwood at the Street Dept. has been fired for being lazy.
>   
>   \* \* \*
>   
>   Thursday Sept 21 I (Tommy Pearson went to Blake Martins office and I told him about the things thats been going on between me and Nathan Haggard that hes rude to me not talking to me when I asked him something about the job or even just speaking early in the morning.
>   
>   Monday Sept 25 I went to Chester and told him about me and Nathan having words and Im not feeling comfortable working with him and Chester said that he would talk to Nathan about it.
>   
>   Oct 4th Me and Nathan Haggard had words among each other like him calling me

names like lazy, good for nothing, stupid bastard and that if he was the supervisor that I wouldve fired you long time ago.

Thursday Oct 5th I (Tommy Pearson) spoke to everyone out loud and Nathan didnt speak so I went back to speak to everyone individually and everyone spoke again except Nathan and the boss (Chester Brymer) said I guess he dont like you Tommy and I said I guess not Chester.

Friday Oct 6th Nathan came to me to apologize to me for calling me stupid bastard, lazy, good for nothing. But he (Nathan) said I will apologize for calling, stupid bastard, good for nothing, but Im not apologizing for calling you lazy because thats what you are.

According to the City of Sherwood, Pearson also quickly began to have disciplinary problems soon after he began work. On August 28, 2006, Brymer gave Pearson a written warning for riding on the lift arm of a tractor after the tractor operator had instructed him not to do so. On September 15, 2006, Brymer suspended Pearson for a day and a half for failure to follow Brymer's instructions to help a crew seal streets. Instead, Pearson rode around in a truck with Roger Turner, who was also instructed to seal the streets.[1] On October 25, 2006, Brymer gave Pearson a written warning because he clocked off work ten minutes early on October 10. On November 14, Brymer asked Pearson to operate the leaf vacuum. According to Brymer, Pearson refused to operate the leaf vacuum. According to Pearson, a co-worker relieved him on the vacuum because he was operating the vacuum too slowly due to his unfamiliarity with it. On November 15, there was a conflict about the extent to which Pearson was able or willing to operate the leaf vacuum, and Brymer terminated his employment.

Pearson's account of his disciplinary issues were kept in his diary as follows:

---

[1] Turner, a white male, was terminated following this incident. According to the City of Sherwood, Brymer intended to give Turner the same discipline as Pearson following this incident but instead fired Turner due to insubordination when Brymer was speaking to Turner about the incident.

4

Wed Aug 16 I (Tommy Pearson was called into the office (Blake Martins) he wanted to talk to me about the things the guys being saying that Im standing around being lazy.

Friday Aug 25 Chester Brymer told me and another employee (Roger Turner) to take the tractor to the garage to be fixed. Roger was driving so I climbed on top of the tractor and rode it to the garage like I was told to do so. When we got back Chester pulled Roger to the side and they talked about what just happen. I was never talked to.

Mon Aug 28 The first thing that morning Chester asked Roger and me to stay in the office so that we could sign our write-up.

Friday Sept 15 I (Tommy Pearson gotten written-up and suspended for being with the wrong employee. Thats what Chester told me and he also said you didnt do anything Tommy just go home. I will see you Tuesday.

* * *

Wed Oct 11 I (Tommy Pearson) was pulled into the office by Chester Brymer and was talked to about leaving early on 10-10-06 and that this is a <u>verbal warning</u> and that is far as its going to go and I said o.k.

Wed Oct 25 I was given a write-up on the situation of me leaving early on 10/10/06. The boss (Chester Brymer) said that he forgot to give it to me when it happen and that the write-up said at the bottom that actions to be taken the dismissal box was checked. Thats saying to me that Im fired or terminated from my job but he never said anything to me so I went back to work like I was told to do so.

Tuesday Nov. 14th Chester told me to get on the vaccum and I said o.k. and I worked on the vaccum for maybe 5-10 mins and another co-worker said that I moving to slow and that I would catch on and move faster later so he took the vaccum out my hand and so I went back.

Wed Nov 15 First thing that morning Chester told me that I was going to run the vaccum sometime that day and I said o.k. let me get custom to the vaccum Ive never done this type of work before and he said you gonna have to pick up the pace and I said o.k.

That morning Chester told me that I have to work with another co-worker by the name of Jim Guyen) to rake leaves to the curb and I said o.k. And I did. Chester call me back in the office around 8:55 am and told me he was releasing me of my duties. And that I didnt do my job, and that I couldnt do my job.

I never got back on the vaccum so how is that you can tell that I cant do my job. I

5

never said that I couldnt, or even wouldnt do my job.

### III.

Pearson alleges that he was subjected to disparate treatment because of his race. When a plaintiff lacks direct evidence of discrimination, he "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973). The Eighth Circuit has defined direct evidence as "'evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision.'" *Cronquist v. City of Minneapolis*, 237 F.3d 920, 925 (8th Cir. 2001) (quoting *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir. 1993)). Here, the only evidence directly reflecting the alleged discriminatory attitude was a statement by Nathan Haggard that he did not like black people. Because Haggard is not a person involved in the decisionmaking process, Pearson must establish a prima face case of racial discrimination.

In *McDonnell Douglas*, the Court stated,

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This *may* be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S. Ct. at 1824 (emphasis added); *see also* 1 BARBARA T. LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW § 2.II.A.2, at 14-15 (C. Geoffrey Weirich et al. eds., 4th ed. 2007). The Court also noted that the "facts necessarily will vary in Title VII cases, and

6

the specification above of the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n.13, 93 S. Ct. at 1824. "Thus, the plaintiff in some cases may be permitted to use different kinds of circumstantial evidence to establish a prima facie case." LINDEMANN & GROSSMAN, EMPLOYMENT DISCRIMINATION LAW § 2.II.A.2, at 17.

In *McDonnell Douglas*, the plaintiff complained that the defendant had refused to rehire him because of his race. *McDonnell Douglas*, 411 U.S. at 796, 93 S. Ct. at 1821. Here, Pearson complains that the defendant discharged him because of his race.

> In order to establish a claim of discriminatory discharge, a plaintiff must typically prove: (1) she or he is a member of a protected class; (2) she or he suffered an adverse employment action; (3) at the time the employer took the adverse employment action she or he was performing at a level that met the employer's legitimate expectations; and (4) the position was filled by a similarly qualified applicant outside the protected class.

LINDEMANN & GROSSMAN, EMPLOYMENT DISCRIMINATION LAW § 2.II.A.2, at 18. The Eighth Circuit Court of Appeals has used similar language – whether or not the claimant was meeting the legitimate expectations of the employer – when determining whether a plaintiff has established a prima facie case of racial discrimination in discharge cases, *Twymon v. Wells Fargo & Co.*, 462 F.3d 925 (8th Cir. 2006), *Riser v. Target Corp.*, 458 F.3d 817 (8th Cir. 2006), as well as in other cases when the claimant was already employed when the alleged discrimination took place, i.e. not during the hiring process, *Clegg v. Arkansas Dep't of Corr.*, 496 F.3d 922 (8th Cir. 2007), *Carpenter v. Con-Way Cent Express, Inc.*, 481 F.3d 611 (8th Cir. 2007). Specifically, the court in *Twymon* articulated the prima facie case and burden-shifting framework in a disparate treatment case in a discharge setting as follows:

> A plaintiff establishes a prima facie case by showing that: (1) []he was a member of a protected class; (2) []he was meeting the employer's legitimate job expectations; (3) []he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently. If a prima facie case is established, a "burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for firing the plaintiff." If the employer makes such a showing, the plaintiff must then demonstrate by a preponderance of the evidence that the stated non-discriminatory rationale was a mere pretext for discrimination.

*Twymon*, 462 F.3d at 934-35 (citations omitted). It should be noted that the fourth element may be more generally described as existing when "there are facts that give rise to an inference of unlawful . . . discrimination." *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 700 (8th Cir. 2006). One manner of satisfying that element is for the plaintiff to show that he was treated differently than similarly situated employees outside the protected class. *See id.* at 700-01.

The City of Sherwood concedes that Pearson is a member of a protected class and that he suffered an adverse employment action. The City of Sherwood focuses its argument on the contention that he was not qualified to be an equipment operator when he applied for the job because he does night have a high school diploma or GED equivalent. Regardless of whether that is true,[2] the more pertinent question at this point is not whether Pearson was qualified when he was hired, but rather whether he was meeting the legitimate expectations of his employer when he was discharged. According to Brymer's deposition, on November 14, 2006, Pearson refused to use a leaf vacuum because it hurt his back, and Brymer did not assign him to another task. On November 15,

---

[2]In Brymer's deposition, he notes that he did not hire Pearson based on his experience but rather "[b]ecause he had the CDL license, and we needed a CDL driver at the time." Furthermore, when asked what the basis was for his decision to hire Pearson, Blake Martin stated in his deposition that Pearson "was the one -- only one qualified for the position that applied at the time." Thus, there is a factual dispute about whether or not Pearson was qualified to be an equipment operator at the time he was hired.

2006, the day Pearson was fired, Pearson was raking leaves when Brymer asked him to relieve a co-worker on the leaf vacuum, which he did for approximately five minutes before he stopped due to his back hurting.  Brymer then terminated his employment.

However, according to Pearson, he began to use the leaf vacuum on November 14 as requested.  Because it was his first time to operate the leaf vacuum and he was unfamiliar with it, one of his co-workers felt he was moving too slowly and so relieved him on the vacuum.  Pearson went back to raking, just as he had been raking prior to taking over the leaf vacuum.  According to Pearson, he never told Brymer that operating the leaf vacuum hurt his back – he had not operated it long enough to cause his back to hurt.  Rather, he may have said that he could see how operating it might hurt his back if he did not learn how to operate it properly, but that he was certainly willing to learn how to operate it and then operate it his fair share of the time.  According to Pearson, the other disciplinary problems he had were not significant.  He was written up on October 25, 2006, for leaving two to three minutes early on October 10, 2006, when Brymer gave Pearson a verbal warning and said there would be no further action.  On or about September 15, 2006, Pearson was reprimanded for something that was outside of his control, and according to Pearson's journal, Brymer even told Pearson that he "didn't do anything."  On August 25, 2006, Pearson rode on the arm of a tractor in violation of a safety regulation, but according to his journal, he was "told to do so."  Pearson has provided evidence that he was meeting his employer's legitimate expectations, particularly since his burden of establishing each element of a prima facie case is not onerous. *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 873 (8th Cir. 2007) (citing *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207 (1981)).

The City of Sherwood also disputes Pearson's ability to establish the fourth element of the

prima facie case. Specifically, the City of Sherwood argues that similarly situated employees outside the protected class were not treated differently. To be similarly situated to a Title VII plaintiff for purposes of a prima facie case, "the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000). Here, there were no other employees of the Street Department who allegedly engaged in the same conduct that caused Pearson to be terminated. Thus, this method of establishing the fourth element does not apply.

There are facts that give rise to an inference of unlawful discrimination. First, according to Brymer's deposition, he has been employed in the City of Sherwood Street Department for nine years and he has been the Street Supervisor for seven and a half years. During that time, he can remember only one African-American, "Joe," whose employment with the Street Department may have lasted longer than six months. The City of Sherwood correctly argues that liability in a disparate treatment case depends on whether the protected trait actually motivated the employer's decision. However, a history of other employees also possessing the protected trait failing to stay employed by the Street Department can serve as circumstantial evidence that the protected trait did play a role in the decision to terminate the plaintiff's employment. Second, if Pearson's testimony is to be believed, there were no work-related reasons for him to be terminated. Third, Pearson was told by a co-worker, Haggard, on his first day of employment, that the Street Department always fired African-American employees after a short time. Finally, Pearson testified that he discussed being discriminated against by his co-workers because of his race with both Brymer and Martin, discussions which Pearson contends Brymer and Martin did not respond to or take seriously. Having

met his burden on the fourth element, Pearson has established a prima facie case of disparate treatment.

Thus, the burden of production shifts to the City of Sherwood to articulate a legitimate, non-discriminatory reason for firing Pearson. "To accomplish this, the defendant must clearly set forth, though the introduction of admissible evidence, the reasons for [its actions]. The explanation provided must be legally sufficient to justify a judgment for the defendant." *Burdine*, 450 U.S. at 255, 101 S. Ct. at 1094 (footnote omitted). The City of Sherwood's Brief in Support of its Motion for Summary Judgment states that Brymer's "decision to terminate Mr. Pearson was based upon Mr. Pearson's work experience not on his race." However, as noted above, there is a genuine issue of fact as to whether Pearson's work experience was deficient. The evidence giving rise to an inference of unlawful discrimination also tends to show that the reason for Pearson's termination may have been a pretext for discrimination. According to the Eighth Circuit, "The ultimate issue in a disparate treatment case under Title VII is whether the prohibited criterion . . . was a factor in the challenged employment decision." *Satz v. ITT Fin. Corp.*, 619 F.2d 738, 746 (8th Cir. 1980). Here, there is a genuine issue of material fact as to whether race was a factor in Pearson's termination. The City of Sherwood's motion for summary judgment on Pearson's disparate treatment claim is therefore denied.

Pearson also brings a claim of hostile work environment. The evidence here is likely insufficient to satisfy the demanding standards established by the Supreme Court "to ensure that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283-84, 141 L. Ed. 2d 662 (1998). However, the evidence Pearson would present on his claim for hostile work environment is strongly interrelated with the evidence on his claim for

disparate treatment. "[A] district court in passing on a Rule 56 motion [for summary judgment] performs what amounts to what may be called a negative discretionary function. The court has no discretion to *grant* a motion for summary judgment, but even if the court is convinced that the moving party is entitled to such a judgment the exercise of sound judicial discretion may dictate that the motion should be *denied*, and the case fully developed." *McLain v. Meier*, 612 F.2d 349, 356 (8th Cir. 1979); *see also* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane Federal Practice and Procedure § 2728, at 525-26 (3d ed. 1998) ("[I]n most situations in which the moving party seems to have discharged his burden of demonstrating that no genuine issue of fact exists, the court has discretion to deny a Rule 56 motion. This is appropriate since even though the summary-judgment standard appears to have been met, the court should have the freedom to allow the case to continue when it has any doubt as to the wisdom of terminating the action prior to a full trial."). Because the evidence for both claims overlaps to a large extent, the City of Sherwood's motion for summary judgment on Pearson's claim for hostile work environment is denied, and Pearson will be allowed to proceed on both claims at trial.

## CONCLUSION

For these reasons, the City of Sherwood's motion for summary judgment is denied Document #9.

IT IS SO ORDERED this 28th day of December, 2007.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE